UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
SAINSLOT BELIZAIRE,                                    :

                                   Plaintiff,          :        12cv08268 (JPO) (DF)

                  -against-                            :        **REPORT AND**
                                                               **RECOMMENDATION**

RAV INVESTIGATIVE AND SECURITY                        :
SERVICES LTD.,
                                                      :

                                   Defendant.
----------------------------------------------------------------------X

**TO THE HONORABLE J. PAUL OETKEN, U.S.D.J.:**

        This matter is currently before the Court for a damages inquest on a judgment entered in

favor of *pro se* plaintiff Sainslot Belizaire ("Plaintiff") against defendant RAV Investigative and

Security Services, Ltd. ("Defendant"), on Plaintiff's employment-related claims.  (*See* Dkt. 13.)

For the reasons that follow, I recommend (1) that Plaintiff be awarded damages calculated as set

out below, and (2) as to certain claims that Plaintiff has not supported with sufficient factual

allegations to justify a damages award, that he be permitted to amend his Complaint to remedy

the pleading defects.

## BACKGROUND

### A.      Factual Background[1]

        Plaintiff commenced this action by filing a Complaint on November 8, 2012, alleging

that Defendant had discriminated against him based on his national origin and age, in violation of

---

[1] Except as otherwise noted, the facts set forth herein are taken from Plaintiff's
Complaint (*see* Complaint for Employment Discrimination, dated Nov. 8, 2012 ("Compl.")
(Dkt. 2)), the allegations of which are accepted as true as a result of Defendant's default (*see*
Discussion, *infra* at Section I); Plaintiff's Affidavit (*see* Affidavit of Sainslot Belizaire, sworn to
Aug. 23, 2013 ("Belizaire Aff.") (Dkt. 17)); and Plaintiff's testimony at the inquest hearing (*see*
Transcript of Proceedings, dated Mar. 26, 2014 ("Tr.") (Dkt. 24)).

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age

Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; and the New

York State Human Rights Law ("HRL"), N.Y. Exec. L. § 290 *et seq.*  (*See* Dkt. 2.)

According to his Complaint, Plaintiff was hired by Defendant as a security guard on

January 14, 2009, and was assigned to a work site at New York University ("NYU"), where he

checked students' identification.  (Compl., at 3, 8.[2])  He had excellent attendance and job

performance.  (*See id.*)  Plaintiff worked five days per week until approximately August 2011,

when his schedule was reduced, without notice, to four days per week.  (*Id.* at 9.)  On the days

that he was scheduled, Plaintiff worked an eight-hour shift, with one half-hour break.[3]  (*See* Tr.,

at 29-30; *see also* Dkt. 17-1 at 18, 19 (earnings statements showing that Plaintiff worked 37.5

hours per week during pay periods in 2009 and 2010).)  Throughout his employment with

Defendant, Plaintiff's wage was $8.00 per hour.  (*Id.*)

Plaintiff claims, however, that Defendant did not pay him in either a timely manner or in

the correct amount.  (*See* Compl., at 3, 8.)  In this regard, Plaintiff asserts that, although his

salary was to be paid "weekly," Defendant's payroll checks were "regularly delayed two or three

weeks apart."  (Belizaire Aff., at 1.)  Moreover, according to Plaintiff, the payroll checks

---

[2] As the Complaint is comprised of several separate documents, not all of which have their own internal pagination, this Court cites to the page numbers stamped onto the combined document when it was filed on the docket via the Court's electronic case filing system.

[3] Plaintiff's documentary evidence suggests that his actual hours may have varied slightly from week to week.  (*See, e.g.*, Dkt. 17 at 17-18 (copies of what appear to be payroll check stubs, on which amounts for gross pay, taxes, and hours are handwritten).)  Nevertheless, as Defendant has defaulted, and as Plaintiff has not explained the significance of the handwritten notes, this Court accepts Plaintiff's good faith recollection of his typical schedule.  *See Reich v. Southern New England Telecomm. Corp.*, 121 F.3d 58, 66-67 (2d Cir. 1997) ("If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."  (internal quotation and citation omitted)).

frequently bounced (Compl., at 8); he asserts that Defendant generally waited about six weeks to replace a bounced payroll check, and that there would frequently be insufficient funds in the company's account to pay the replacement check as well (*see* Tr., at 10-12, 16-17). Plaintiff also contends that, while other employees were permitted to take vacation annually, Defendant never permitted him to do so. (Compl., at 3; *see also id*. at 8 (Plaintiff alleging, in attached administrative complaint, that he "never received a vacation or a day off as everyone else did").)

Plaintiff, at 51 years old, was the oldest employee and the only employee of Haitian national origin at his work site. (*Id.* at 8-9.) Plaintiff asserts that he never saw another employee treated in the same manner that he was treated. (*Id.* at 9.)

In December 2011, when Plaintiff received three paychecks from Defendant that were returned by the bank due to insufficient funds, he reported the issue to the Department of Labor. (*See id.* at 9.) On December 30, 2011, he also returned three bounced checks to Defendant and asked to be paid by certified check. (*Id.*) Then, on January 2, 2012, operations manager Terry Greenidge called Plaintiff, informed him that he no longer worked at NYU, and directed the police to escort him off the premises. (*See id.* at 8-9.) Defendant never called Plaintiff to work at any other site. (*Id.* at 9.) Defendant still owed Plaintiff wages at the time of Plaintiff's termination (*see* Tr., at 38), but Plaintiff did not receive any wages from Defendant thereafter (*see id.* at 39).

**B.** **Procedural History**

On January 17, 2012, Plaintiff filed a charge with the New York State Division of Human Rights and, through that agency, with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant had subjected him to unlawful discrimination in his employment and termination from employment, as a result of his national origin and age, and in

3

retaliation for his filing of a complaint against Defendant with the Department of Labor.  (*See* Compl., at 8-10.)  On September 28, 2012, having "adopted the findings of the state or local fair employment practices agency that investigated this charge,"[4] the EEOC informed Plaintiff that it was closing its case file and advised Plaintiff of his right to sue in federal court.  (*Id.* at 5-7.)

Plaintiff filed his *pro se* Complaint in this case on November 8, 2012 (Dkt. 2), along with a request to proceed *in forma pauperis* (Dkt. 1), which was granted (*see* Dkt. 4).  Service was effected on Defendant by the U.S. Marshals Service on April 5, 2013.  (*See* Dkt. 9.)  Defendant's answer to the Complaint was therefore due on April 26, 2013 (*see id.*), but, to date, Defendant has neither filed an answer, nor otherwise appeared in this proceeding.

The Clerk of Court entered Defendant's default on May 10, 2013 (*see* Dkts. 10, 11), and Plaintiff moved for a default judgment the same day (*see* Dkt. 12).  On June 14, 2013, the Court (Oetken, J.) directed the entry of a default judgment against Defendant and referred the matter to this Court for an inquest on damages.  (*See* Dkt. 13.)  A default judgment against Defendant was entered on June 19, 2013.  (*See* Dkt. 14.)  On July 26, 2013, Plaintiff wrote to this Court, requesting that the default judgment be "implement[ed]" and that Defendant be ordered to pay damages and interest in the amount of $385,000 (*see* Dkt. 15), and this Court then set a schedule for Plaintiff to submit proposed findings of fact and conclusions of law concerning his damages (*see* Dkt. 16).  In particular, this Court directed Plaintiff to explain how he calculated any damages figures and to support his damages with an affidavit and documentary evidence.  (*See id.*)  The Court also cautioned Defendant that, if it failed to respond to Plaintiff's submission or

---

[4] The record of this case does not contain these findings.

4

to contact the Court by October 16, 2013 to request a hearing, this Court intended to issue a report and recommendation on the basis of Plaintiff's written submission alone.  (*See id.*)

Plaintiff timely submitted an affidavit and supporting documentation, as well as an affirmation of service.  (*See* Dkts. 17, 18.)  Plaintiff's affidavit, however, provided few facts or allegations not contained in the Complaint, and the supporting documents he submitted consisted only of the following:

(a)  a copy of a letter from the New York State Department of Labor, dated December 6, 2012, stating that Plaintiff's case had been referred to an investigator (*see* Dkt. 17 at 6);

(b)  copies of several documents related to Plaintiff's denial of public benefits in February and March of 2012 (*see id.* at 7-14);

(c)  copies of two notices from Chase Bank, each indicating that a particular check issued from Defendant to Plaintiff was being returned due to insufficient funds (*see id.* at 15, 20);

(d)  copies of two letters from Plaintiff to Defendant demanding reissuance of paychecks that did not clear due to insufficient funds (*see* Dkt. 17-1 at 1, 23-24); and

(e)  copies of 10 checks (and what appears to be 42 check stubs, and five backs of checks)[5] apparently issued by Defendant, ranging in amount from $160.08 to $471.30; it appears that three of the checks were returned by a bank without explanation; two others were returned for the explicit reason (as indicated by the code "NSF") that the account had insufficient funds to cover the checks; and three others were marked "replacement ck" (*see* Dkts. 17, 17-1).

When Defendant's deadline to oppose Plaintiff's submission passed without any opposition having been filed by Defendant, Plaintiff wrote to alert the Court.  (*See* Dkt. 20.)  On

_____

[5] As some of the check and stub numbers are illegible or cut off, and as the images of backs of checks do not bear any numbers at all, it is unclear how many separate checks this submission represents.

5

December 11, 2013, Plaintiff again wrote to the Court, urging that damages be awarded to him, as Defendant "seem[e]d to have deliberately trampled all legal proceedings" related to his case. (Dkt. 21.)  On February 28, 2014, in order to obtain clarification of the documents presented by Plaintiff and the basis for his claim for $385,000 in damages, this Court issued an Order scheduling an inquest hearing.  (*See* Dkt. 23.)

On March 26, 2014, this Court held an inquest hearing, at which Plaintiff testified and submitted additional documentary evidence.  (*See* Tr.; Dkt. 26.)  As Plaintiff did not have the benefit of counsel, the Court attempted to elicit testimony from him that would assist the Court in ascertaining his damages; in this regard, the Court asked Plaintiff questions concerning, *inter alia*, the frequency with which Defendant had issued bad checks to him (*see* Tr., at 6), whether Defendant had ever issued valid replacement checks for those checks that did not initially clear (*see id*. at 10, 16-18, 38), which of the copies of paychecks and stubs that he had submitted represented checks that had not cleared (*see id.* at 13-14, 54), whether individuals similarly situated to him had received vacation time, sick time, and other benefits that were allegedly denied to him (*see id.* at 21-30), and the type of emotional distress that he had suffered (see *id.* at 57-62).

As Plaintiff's testimony was often vague, and as Plaintiff indicated that he could provide a written submission detailing his calculation of the damages due to him and explaining the significance of the documents already submitted (*see id.* at 18-19), this Court afforded Plaintiff an additional opportunity to substantiate his damages.  By Order dated April 24, 2014, the Court specifically directed Plaintiff to supplement his written submissions and oral testimony with details about his unpaid wages and benefits, emotional distress, and the back pay he was claiming.  (*See* Dkt. 27.)  Defendant did not appear at the March 26, 2014 hearing, but, as the

Court subsequently realized that its Order scheduling that hearing had been mailed to an incorrect address for Defendant, the Court advised Defendant, in its April 24, 2014 Order, that Defendant should notify the Court within three weeks, should it wish to be heard on the appropriate scope of damages.

Plaintiff timely supplemented his prior submissions with new documents, including a letter from a physician (Dkt. 28 at 2), a letter regarding his current employment status (*id.* at 3), rent receipts from February 1, 2012 through May 1, 2014 (*id.* at 5-12), and emails that appear to be related to his search for employment (*id*. at 17-30).  In addition, Plaintiff resubmitted documents related to his denial of public benefits.  (*See id.* at 13-16.)  While Plaintiff also included a short spreadsheet purporting to itemize his damages – with line items for three years of salary (less "late payments received"); a claimed denial of assistance by the Human Resources Administration (listed as "HRA cash assistance request"); Plaintiff's supposed rent arrears; his claimed lost Social Security benefits; his claimed lost severance pay, vacation pay, and sick pay; and a figure for "retaliation value" (*see id*. at 4) – Plaintiff did not provide evidence from which the Court could verify most of the figures listed on the spreadsheet, and he did not provide any further explanation or clarification of his prior submissions.

Defendant neither filed an opposition to Plaintiff's supplemental submission, nor otherwise contacted the Court.

## DISCUSSION

## I.   APPLICABLE LEGAL STANDARDS

### A.   Default Judgment

Under Rule 55 of the Federal Rules of Civil Procedure, a party defaults when it "has failed to plead or otherwise defend" against a judgment for affirmative relief.  Fed. R.

Civ. P. 55(a).  There is no question that "default is an admission of all well-pleaded allegations against the defaulting party," *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004), and that "a default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability," *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973).  Thus, as a general matter, a district court must accept as true all of the factual allegations of the non-defaulting party and draw all reasonable inferences in its favor.  *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).

The court, however, "need not agree that the alleged facts constitute a valid cause of action," *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981), but is instead "required to determine whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law," *Finkel*, 577 F.3d at 84.; *Taizhou Zhongneng Import and Export Co., Ltd. v. Koutsobinas*, 509 F. App'x 54, 56 (2d Cir. 2013) (summary order).  Accordingly, a court must consider whether the complaint alleges "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and find it lacking where the complaint "tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Twombly*, 550 U.S. at 557); *see TAGC Management, LLC v. Lehman, Lee & Xu Ltd.*, 536 F. App'x 45, 47 (2d Cir. 2013) (on appeal from a grant of default judgment, analyzing the legal sufficiency of the allegations under the standards enunciated in *Twombly* and *Iqbal*).  This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.

In evaluating a *pro se* complaint, a court is not limited to the causes of action specified by the plaintiff, but instead "must construe it liberally, applying less stringent standards than when a plaintiff is represented by counsel," *Branham v. Meachum*, 77 F.3d 626, 628-29 (2d Cir. 1996), and must construe it to raise the strongest claims it suggests, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (collecting authority).  The court is charged with the obligation to "make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training."  *Id.*  (internal quotation marks and citations omitted).  Thus, a *pro se* plaintiff is not required to articulate the appropriate legal theory under which relief may be granted, but instead must only allege sufficient facts to make out an actionable claim.  *See*, *e.g.*, *Soto v. Walker*, 44 F.3d 169, 170 (2d Cir. 1995) (finding that district court erred by interpreting *pro se* complaint as based solely on the theory of relief raised most directly by plaintiff's allegations, where "the facts [plaintiff] alleged clearly describe an actionable due process violation," and reversing dismissal of complaint); *see also Bey v. Welsbach Elec. Corp.*, No. 01cv2667 (LAP), 2001 WL 863419, at *1 (S.D.N.Y. July 30, 2001) (construing *pro se* complaint to include additional cause of action, separate from the legal grounds for relief that plaintiff had articulated, where plaintiff had set forth facts that could give rise to the additional claim).

In employing this liberal standard, however, a court must still ensure that the *pro se* complaint "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Bell Atlantic Corp v. Twombly*, 550 U.S. 554, 555 (quoting *Conley v. Gibson*, 335 U.S. 41, 47)).

**B.**      **Damages**

In conducting an inquest on default, a court accepts as true all of the factual allegations of

the complaint, *except* those relating to damages. *Au Bon Pain Corp.*, 653 F.2d at 65.  A plaintiff

must therefore substantiate a claim with evidence to prove the extent of damages. *See Trehan v.*

*Von Tarkanyi*, 63 B.R. 1001, 1008 n.12 (S.D.N.Y. 1986) (plaintiff must introduce evidence to

prove damages suffered and the court will then determine whether the relief flows from the facts

(citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974))).  If a plaintiff fails to demonstrate its

damages to a reasonable certainty, then the court should decline to award any damages, even

where liability has been established through default. *See Lenard v. Design Studio*, 889 F. Supp.

2d 518, 538 (S.D.N.Y. 2012); *Griffiths v. Francillon*, No. 10cv3101 (JFB) (GRB),

2012 WL 1341077, at *2 (E.D.N.Y. Jan. 30, 2012), *report and recommendation adopted*,

2012 WL 1354481, at *2 (Apr. 13, 2012).

Where a defaulting defendant has not made any submission on a damages inquest, the

court must assess whether the plaintiff has provided a sufficient basis to determine damages, *see*

*Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997)

(the court "should take the necessary steps to establish damages with reasonable certainty"), and

may determine the adequacy of the plaintiff's damages claim based on the plaintiff's submitted

proofs, *see, e.g., Garden City Boxing Club, Inc. v. Hernandez*, No. 04cv2081 (LAP) (DF),

2008 WL 4974583, at *4-5 (S.D.N.Y. Nov. 24, 2008).  In its discretion, the court may also hold

a hearing to assess the amount of damages that should be awarded on a default. *See*

Fed. R. Civ. P. 55(b)(2); *see also Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993)

(judges are given much discretion to determine whether an inquest need be held); *Action S.A. v.*

*Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991) (Fed. R. Civ. P. 55(b)(2) "allows but does

10

not require . . . a hearing"); *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989) ("[b]y its terms, [Rule] 55(b)(2) leaves the decision of whether a hearing is necessary to the discretion of the district court").

Regardless of the submitted proofs or testimony, though, damages awarded upon a defendant's default "must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  Fed. R. Civ. P. 54(c).  While the Second Circuit has not specifically addressed what might constitute damages that "differ in kind," courts in this jurisdiction have interpreted the Rule 54(c) requirement to turn on defendant's receipt of adequate notice of the scope of damages.  *See*, *e.g.*, *Gucci America, Inc. v. Gold Center Jewelry*, 997 F. Supp. 339, 404 (S.D.N.Y. 1998) ("The rationale for the rule, insofar as it applies to default judgments, 'is that default is tantamount to consent to the entry of judgment, but this consent is effective only to the extent that it was duly informed.'" (quoting 10 Moore's Federal Practice § 54.71, at 54-127 (3d ed. 1997))); *Capgemini U.S., LLC v. EC Manage, Inc.*, No. 10cv2486 (GBD) (HPD), 2012 WL 5931837, at *6 (S.D.N.Y. Nov. 7, 2012) (where *ad damnum* clause requested $1,000,000 "plus interest," "the Complaint put the defendants on notice that they could be liable for an amount in excess of $1,000,000 once interest was computed," and therefore interest award would not violate Rule 54(c)), *report and recommendation adopted*, 2012 WL 5938590 (Nov. 27, 2012).

Thus, courts have strictly construed the damages provisions of complaints awarding damages on default.  *See*, *e.g.*, *Marina B Creation S.A. v. de Maurier*, 685 F. Supp. 910, 912-13 (S.D.N.Y. 1988) (declining to award treble damages requested in memorandum of law where such damages were not specified in either complaint or notice of motion for default); *Jowers v. DME Interactive Holdings, Inc.*, No. 00cv4753 (LTS) (KNF), 2006 WL 1408671, at *9

11

(S.D.N.Y. May 22, 2006) (declining to award statutory liquidated damages where "the complaint did not give notice that [plaintiff] was seeking liquidated damages by making a citation to the applicable provisions of New York's Labor Law"); *New York City Dist. Council of Carpenters Pension Fund v. Quantum Const.*, No. 06cv13150 (GEL) (JCF), 2008 WL 5159777, at *4, *11 (S.D.N.Y. Dec. 9, 2008) ("damages should be limited to the time period set forth in the [c]omplaint").  As discussed in greater detail in Section III, *infra*, however, such strict construction may not be appropriate in the case of a *pro se* plaintiff.  *See Poliard v. Saintilus Day Care Ctr., Inc.*, No. 11cv5174 (MKB) (LB), 2013 WL 1346238, at *5 n.9 (E.D.N.Y. Mar. 7, 2013) ("Although the 'Wherefore' clause does not explicitly state that plaintiff seeks prejudgment interest, in light of plaintiff's *pro se* status and her reliance on a form complaint distributed by the Clerk's Office, this Court liberally construes plaintiff's complaint to include a request for pre-judgment interest here."), *report and recommendation adopted*, 2013 WL 1346398 (Apr. 2, 2013).

## II.   PLAINTIFF'S CLAIMS

Without a response from Defendant, this Court must first determine whether, with respect to each element of his claims, Plaintiff's allegations in the Complaint are sufficiently "well pleaded" to establish Defendant's liability.  *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011); *Bambu Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d 849, 854 (2d Cir. 1995).  Only if the allegations are sufficient to state a claim, should the Court then proceed to determine the appropriate amount of damages to be awarded.  In conducting this analysis, this Court is mindful that it must construe Plaintiff's submissions liberally, as he is acting *pro se*, *see Triestman*, 470 F.3d 471, 474, and must accept all of the factual allegations in the Complaint as true and draw all reasonable inferences in his favor, *see Finkel*, 577 F.3d at 84.

12

## A.    <u>National Origin and Age Discrimination Claims</u>

Plaintiff appears to contend that Defendants mistreated him, on account of his national origin and/or age, by: (1) failing to pay him, or paying him late and/or with bounced checks; (2) prohibiting him from taking vacation days or other days off; (3) reducing his work schedule from five days per week to four days per week, without notice; (4) failing to promote him; and (5) terminating his employment either discriminatorily or in retaliation for Plaintiff's opposition to Defendant's other discriminatory acts. (*See* Compl., at 2-3.) The Complaint identifies Title VII, the ADEA, and the NYSHRL as the legal bases for Plaintiff's discrimination claims. (*See* Compl., at 1.)[6]

Title VII provides that it shall be unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). Pursuant to the ADEA, it is also unlawful to engage in such discriminatory employment practices because of the employee's age, *see* 29 U.S.C. § 623(a)(1), where the employee is at least 40 years old, *id.* § 631(a). The NYSHRL, for its part, broadly prohibits discrimination on the basis of, *inter alia*, national origin and age. *See* N.Y. Exec. L. § 296(1)(a).

---

[6] Plaintiff did not check the line on his *pro se* form discrimination Complaint to indicate that he was also filing under the New York City Human Rights Law, N.Y.C. Code § 8-107 ("NYCHRL"). (*See* Compl., at 1.) Insofar as Plaintiff alleges that he was discriminated against on the basis of his national origin and age, the NYCHRL might also provide a basis for relief. It is unclear whether *Soto*, 44 F.3d at 170, requires a court to consider a statutory claim *explicitly omitted* by a *pro se* plaintiff on a form complaint, when a liberal reading of the factual allegations would suggest the omitted claim. This Court, however, need not reach this issue, as, for the reasons noted *infra*, the amount of damages to which Plaintiff is entitled on this inquest would not be affected by the presence or absence of an NYCHRL claim.

As a threshold matter, each statute applies only to employers of a particular size: Title VII applies to employers with at least 15 employees "for each working day in each of twenty or more calendar weeks in the current or preceding calendar year," 42 U.S.C. § 2000e(b); *see Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006) (holding that the "threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue"); the ADEA applies to employers with at least 20 employees over the same period, 29 U.S.C. § 630(b); and, except for the employment of domestic workers, the NYSHRL applies to employers with at least four employees, *see* N.Y. Exec. L. § 292(5).[7]

Plaintiff does not specifically allege the number of employees that Defendant employed. This Court, however, may take judicial notice of the information contained on Defendant's own website, *see Doron Precision Systems, Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) ("[A] court may take judicial notice of information publically announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" (quoting Fed. R. Evid. 201(b))), representing that Defendant has over 100 corporate and field staff members.[8]  Given these representations, the Court can take judicial notice of Defendant's size and conclude that Defendant meets the threshold size requirements of Title VII, the ADEA, and the NYSHRL.

To state a cause of action for discrimination under Title VII, the ADEA, or the NYSHRL, a plaintiff must allege that:  (1) he was a member of a protected group; (2) he was qualified for

---

[7] In addition, for both Title VII and the ADEA, the employer must also be "engaged in an industry affecting commerce" or be an agent for such an entity.  42 U.S.C. § 2000e(b); 29 U.S.C. § 630(b).

[8] *See* http://www.ravsecurity.com/staff.html, accessed Oct. 14, 2014.

14

the position or performed it satisfactorily; (3) he suffered an adverse employment action;

and (4) the adverse action occurred under circumstances giving rise to an inference of

discriminatory intent.[9]  *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)

(collecting cases decided under Title VII, the ADEA, and other anti-discrimination statutes);

*Donohue v. Finkelstein Memorial Library*, 987 F. Supp. 2d 415, 424 n.2 (S.D.N.Y. 2013)

("Claims of employment discrimination under the New York State Human Rights Law are

generally analyzed under the same substantive standards that govern claims under Title VII."

(citation omitted)); *see also Hagan v. City of New York*, No. 13cv1108 (JPO) (DF), 2014 WL

4058067, at *7 (S.D.N.Y. Aug. 15, 2014) (noting that "[t]he elements of a *prima facie* case can

help provide an outline of what is necessary to render [the plaintiff's] claims for relief plausible"

(internal quotation marks and citation omitted)).  An "adverse employment action," within the

meaning of these statutes, is "a materially adverse change in the terms and conditions of

employment," such as "termination of employment, a demotion evidenced by a decrease in wage

or salary, a less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices unique to a particular situation."  *Sanders v. N.Y.C. Human Res.*

*Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotations and citations omitted).

---

[9] Title VII and the ADEA ultimately hold a plaintiff to different standards with respect to causation.  *See Gross v. FBL Financial Svcs., Inc.*, 557 U.S. 167, 173-78 (2009) (on a challenge to jury instructions, noting that Title VII and the ADEA are "materially different with respect to the relevant burden of persuasion" and that a plaintiff must show that "age was the but-for cause of the employer's adverse action" to prevail on an ADEA claim, whereas a Tile VII plaintiff must only establish that the protected characteristic was a "motivating factor" in the adverse employment action); *see also Bohnet v. Valley Stream Union Free School Dist. 13*, No. 12cv1989 (DRH) (ARL), 2014 WL 3400462, at *4 (E.D.N.Y. July 14, 2014) (noting that, for an ADEA claim to survive a motion to dismiss, the complaint must "contain sufficient facts to make plausible the conclusion that 'but for' her age plaintiff would have been hired").

Here, Plaintiff has adequately pleaded the first three substantive elements of a discrimination claim under Title VII, the ADEA, and the NYSHRL.  First, he was at all relevant times a member of a "protected group" with respect to both national origin and age.  *See* 42 U.S.C. § 2000e-2(a)(1) (national origin); 29 U.S.C. § 631(a) (age 40 and older); N.Y. Exec. L. § 296(1)(a) (national origin and age).  Born in 1960, Plaintiff was over 40 years old throughout his employment with Defendant (*see* Compl., at 3), and he is also of Haitian national origin (*id.* at 3, 8).  Second, Plaintiff asserts that his attendance and job performance as a security guard were "excellent."  (*Id.* at 8.)  Third, each of the actions that Plaintiff alleges Defendant took against him – paying his wages late and with bad checks, prohibiting him from taking leave, reducing his work schedule from five to four days per week, failing to promote him, and terminating his employment – could constitute an actionable adverse employment action, as a "materially adverse change in the terms and conditions" of employment with Defendant.  *See Caskey v. County of Ontario*, 560 F. App'x 57, 58-59 (2d Cir. 2014) (summary order listing, as examples of adverse employment actions, "termination of employment, a demotion evidenced by a decrease in wage or salary, . . . [and] a material loss of benefits"); *Robinson v. Goulet*, 525 F. App'x 28, 30-31 (2d Cir. 2013) (summary order finding that the plaintiff, a black woman, had plausibly stated a claim for unlawful discrimination, where, *inter alia*, her work hours were reduced, while male and white employees did not experience similar reductions); *Petrosino v. Bell Atlantic*, 385 F.3d 210, 226-27 (2d Cir. 2004) (describing elements of *prima facie* claim under Title VII for discriminatory failure to promote).

With respect to the fourth and final element, that the adverse action occurred under circumstances giving rise to an inference of discriminatory intent, the sufficiency of Plaintiff's pleadings varies.  Plaintiff claims that he was the oldest employee at the NYU work site, the only

employee of Haitian national origin, and the only one mistreated by Defendant.  (*See* Compl., at 9.)  He further asserts a belief that his national origin and age were reasons for the disparate treatment.  (*Id.*)  Although "more favorable treatment of employees not in the protected group" may support an inference of discrimination, *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009), *superseded on other grounds by statute, as recognized in Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013), this Court finds that it would be unreasonable to draw a blanket inference of discriminatory intent from Plaintiff's allegations, and instead separately addresses each adverse action purportedly taken by Defendant.

### 1.   <u>Failure to Promote</u>

Plaintiff has pleaded no particular facts to support his bare allegation that Defendant discriminatorily failed to promote him.  He has not alleged, for example, that Defendant rejected him for any positions for which he applied, or even that any higher-level positions were available during the course of his employment.  Indeed, the *only* indication in Plaintiff's form Complaint that he suffered discrimination in this regard is the check mark that Plaintiff placed next to "Failure to promote me" in the section of the form listing types of discriminatory conduct and directing the author to check those that apply.  (Compl., at 2-3.)  With respect to this aspect of Plaintiff's claim, then, the Complaint lacks sufficient factual allegations to render his assertion that Defendant discriminatorily failed to promote him "plausible on its face."  *Twombly*, 550 U.S. at 570.  Thus, in this Court's view, Plaintiff has not established Defendant's liability as a matter of law, under Title VII, the ADEA, or the NYSHRL, for Defendant's failure to promote him.  *See Mickalis Pawn Shop, LLC*, 645 F.3d at 137.[10]

---

[10] For the same reason, Plaintiff has also failed to state a plausible claim under the NYCHRL (*see* n.6, *supra*); although the NYCHRL requires a broad construction and a

2.    **Reduction of Work Schedule**

Plaintiff alleges that his work schedule was reduced, without notice, in August 2011. (Compl., at 9.)  Plaintiff, however, has pleaded no facts in support of his claim that this reduction in hours was discriminatory, such as facts suggesting that other employees, who were similarly situated, did not have their work schedules altered.  On the contrary, Plaintiff has alleged at least some facts that suggest that the reduction in his work schedule may have been attributable to an attendance issue; specifically, Plaintiff alleges that the adjustment to his schedule was made after he returned from a four-day absence, during which he had "asked a co-worker to cover for [him]."  (*Id.*)  Plaintiff does not allege whether his absence was approved by Defendant, whether it was permissible for him to ask a co-worker to handle his work for him, or even whether the co-worker actually did cover the work.

In these circumstances, and without any further factual allegations to support Plaintiff's claim of discrimination, this Court concludes that it would be unreasonable to infer that Defendant, after employing Plaintiff continuously for over two and a half years, suddenly reduced his hours *because of* his Haitian national origin or age.  Given that Plaintiff's Complaint, as pleaded, does not support "more than a sheer possibility" that Defendant reduced his hours in violation of Title VII, the ADEA, or NYSHRL, *Iqbal*, 556 U.S. at 678, this Court recommends

---

"separate[] and independent[]" analysis from federal and state law, *Mihalik,* 715 F.3d at 109, it "still requires a showing of some evidence from which discrimination can be inferred," *Sletten v. LiquidHub, Inc.*, No. 13cv1146 (NRB), 2014 WL 3388866, at *9 (S.D.N.Y. July 11, 2014) (citing *Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 20 (2d Cir. 2013)).  Similarly, to the extent Plaintiff's factual allegations are insufficient to state a plausible federal or state discrimination claim based on the alleged reduction of his work hours, the termination of his employment, or an alleged denial of vacation time (*see infra* at ¶¶ 2-4), he likewise has not stated such a claim under the NYCHRL.

finding that Defendant cannot currently be held liable on this aspect of Plaintiff's discrimination claims.

### 3.      Termination of Employment

Likewise, Plaintiff has not alleged any facts from which it could reasonably be inferred that, in terminating Plaintiff's employment, Defendant acted with discriminatory animus based on Plaintiff's national origin and/or age.  Instead, Plaintiff alleges that he was terminated shortly after making complaints to the Department of Labor and to Defendant regarding Defendant's pay practices.  It would be unreasonable to infer, from these allegations alone, that Plaintiff's termination was discriminatory in nature.  Plaintiff's pleading is therefore inadequate to entitle him to relief for unlawful termination in violation of Title VII, the ADEA, or the NYSHRL.

### 4.      Unpaid and/or Late Wages and Denial of Benefits

Unlike Plaintiff's other discrimination claims, his claims regarding Defendant's failure to pay wages due (and/or to make timely payment of his wages), as well as his claim for denial of vacation and/or sick days, are not based on discrete events but rather appear to be based on conduct that allegedly continued throughout his employment.  For that reason, it could be inferred that the disparate treatment he experienced was because he was Haitian and/or because he was older than the other employees, as those are characteristics that differentiated him from his co-workers, who were allegedly treated more favorably throughout the same time period.[11]

---

[11] While Plaintiff did not check the line on his *pro se* form Complaint indicating that he was complaining of "[u]nequal terms and conditions of [his] employment" (Compl., at 2), he did make factual allegations of disparate treatment in his underlying administrative complaint, which he attached to, and made part of, his Complaint in this action (*see id.* at 8-9), and this Court will therefore consider the sufficiency of those allegations.

Plaintiff's additional allegations, however, undermine the reasonableness of that inference with respect to his claim that he was discriminatorily denied vacation or other time off from work.  In particular, Plaintiff states that, "whenever [he] requested leave," Defendant informed him that "there was no one to replace [him]."  (Compl., at 8.)  Plaintiff does not suggest that there *was* another security guard available to cover for him or that other security guards were permitted to take leave in or around the same time periods in question.  Nor does Plaintiff provide any factual allegations capable of suggesting that Defendant's stated, non-discriminatory reason for denying him leave, whether on one occasion or on a recurring basis, was a pretext for unlawful discrimination.  Under the circumstances, this Court cannot conclude that any regular denial by Defendant of Plaintiff's requested vacation time or other leave was rooted in discriminatory animus, and finds that Plaintiff has currently failed to state a claim under Title VII, the ADEA, or NYSHRL with respect to a discriminatory denial of vacation or similar benefits.[12]

In contrast, by alleging that Defendant repeatedly failed to pay, and/or delayed the payment of his wages, and that he, as the only one of Defendant's employees of his national origin and age, was the only one of Defendant's employees who was subjected to this treatment (*see* Compl., at 8-9), Plaintiff has – if barely – pleaded circumstances giving rise to an inference of discriminatory intent.  Although Plaintiff's allegations of disparate treatment are thin, this Court concludes that they are sufficient, in the inquest context, to entitle him to potential relief

---

[12] The Court further notes that the documentation submitted by Plaintiff in connection with this inquest tends to undermine his claim that he was consistently denied vacation benefits, as one of the check stubs he submitted expressly states that that the pay was for "vacation."  (*See* Dkt. 17-1 at 14.)

under Title VII, the ADEA, and/or the NYSHRL.[13]   In light of the discussion above, this Court also concludes that this is the only discrimination claim that Plaintiff has pleaded sufficiently to warrant the Court's consideration of damages.

### B.    Retaliation in Violation of Anti-Discrimination Statutes

In his Complaint, Plaintiff alleges that, because he "opposed discrimination," he was "subject to unlawful discriminatory actions" (Compl., at 3), which may give rise to a claim for retaliation under the anti-discrimination statutes.   To establish retaliation under Title VII, the ADEA, or the NYSHRL, a plaintiff must show (1) that he participated in a protected activity, (2) that his employer was aware of the protected activity, (3) that his employer took adverse employment action against him, and (4) that there was a causal connection between the protected activity and the adverse employment action.   *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710 (S.D.N.Y. 2005) (applying federal law) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312-13 (2004) (applying state law).   "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination," *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir.

---

[13] These same allegations could also be sufficient to entitle Plaintiff to relief under the NYCHRL, *see Garrigan v. Ruby Tuesday, Inc.*, No. 14cv155 (LGS), 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014), should the Court find that a claim under that law is not precluded by Plaintiff's failure to check the relevant line on his *pro se* form Complaint (*see* n.6, *supra*).   A plaintiff, however, should not recover twice for the same injury, *see, e.g., Jiao v. Shi Ya Chen*, No. 03cv0165 (DF), 2007 WL 4944767, at *17 (S.D.N.Y. Mar. 30, 2007), and, as discussed further below, this Court recommends that, to the extent Plaintiff is awarded damages to compensate him for withheld wages, the award be made under framework of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*   Indeed, as Plaintiff's allegations are clearly sufficient to state a claim for unpaid or late-paid wages under the FLSA (*see infra* at Section II(C)), this Court would recommend that he be awarded the same compensatory damages under that statute, regardless of whether the Court finds that he has adequately pleaded *any* discrimination claim.

2000) (citing 42 U.S.C. § 2000e-3, *superseded by statute on other grounds*, and may take the form of either formal or informal complaints, *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 466 (S.D.N.Y. 2006). To constitute protected activity, the plaintiff's conduct "'must [have] put the employer on notice that the [plaintiff] believe[d] that discrimination [was] occurring.'" *Id.* (quoting *Ramos v. City of New York*, No. 96cv3787 (DLC), 1997 U.S. Dist. LEXIS 10538, at *7 (S.D.N.Y. July 22, 1997)).

In this case, the allegations in Plaintiff's Complaint, even if true, are insufficient to establish that he engaged in any protected activity (*i.e.*, action in opposition to discrimination based on his age or national origin) while he was employed by Defendant. Based on his Complaint and the attached administrative charge, Plaintiff filed a complaint with the New York State Division of Human Rights (and the EEOC) on January 17, 2012 (Compl., at 3, 10), over two weeks after Defendant had terminated his employment. Although Plaintiff alleges that, in December 2011 – shortly before he was fired – he complained to both the Department of Labor and to Defendant regarding his bounced paychecks (*id.* at 2), he does not allege that he complained of any *discriminatory* conduct, which would constitute protected activity under the anti-discrimination statutes. Thus, while Plaintiff's allegations, liberally construed, may be sufficient to state a claim for retaliatory discharge under the federal or state labor laws (*see infra* at Section D), this Court recommends finding that he has failed to state a claim for retaliation under Title VII, the ADEA, or the NYSHRL.

C.     **Wage Claims**

Although Plaintiff expressly asserts discrimination claims, the primary conduct about which he complains is Defendant's purported failure to pay his wages fully and on time, and Defendant's firing him after he complained about bounced paychecks. Even though Plaintiff did

not cite any labor laws in his *pro se* Complaint, these allegations make it clear that Plaintiff has raised wage claims and retaliatory discharge claims that logically fall under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, and the New York Labor Law ("NYLL"), N.Y. Lab. L. §§ 190, *et seq.*, and that warrant this Court's analysis.

The FLSA sets federal minimum wage, overtime pay, equal pay, recordkeeping, and child labor standards for employers.  29 U.S.C. §§ 201 *et seq.*  Its applicability is limited to employees who are "engaged in commerce or in the production of goods for commerce" or who are "employed in an enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 206(a).  As noted above, this Court may take judicial notice of the information that Defendant holds out as true on its publicly available website, which indicates that Defendant maintains offices in New York, New Jersey, and Pennsylvania; that it is also licensed in Connecticut, California, and Florida; that it provides, among other security services, armed courier service and pre-employment screening; and that it has over 100 staff members. (*See* n.8, *supra*.)  From these facts, it could reasonably be inferred that Defendant is an "enterprise" within the meaning of the FLSA, *see* 29 U.S.C. § 203(s)(1), as at least some of its employees (such as those responsible for courier services) would appear to be engaged in commerce, and the business would almost certainly require more than $500,000 in gross revenue simply to make payroll for over 100 employees.

The minimum wage applicable to an employee in New York is governed by an interplay of the FLSA and the NYLL.  For the period of Plaintiff's employment, the FLSA established a federal statutory minimum wage for covered employees of $6.55 per hour (from July 24, 2008 through July 23, 2009), and then $7.25 per hour (from July 24, 2009 forward).  29 U.S.C. § 206(a)(1)(B)-(C).  For the same period, the NYLL set a state minimum wage, but, where the

federal minimum wage was higher, the federal minimum wage controlled.  N.Y. Labor L.

§ 652(1) (eff. Dec. 6, 2004 to Mar. 28, 2013) (for the period on and after January 1, 2007, setting

the minimum wage at $7.15 per hour "or, if greater, such other wage as may be established by

federal law pursuant to 29 U.S.C. section 206").  Thus, when Plaintiff was hired by Defendant on

January 14, 2009, the applicable state minimum wage was $7.15 per hour, *see id.*, and on

July 24, 2009, it increased to $7.25 per hour, *see* 29 U.S.C. § 206(a)(1)(C) (increasing federal

minimum wage from $6.55 to $7.25, 24 months and 60 days after May 25, 2007).

      Both the FLSA and the NYLL also govern, in different respects, the timing of payments

from an employer to an employee.  While the statutory language of the FLSA does not prescribe

any particular payment schedule, courts have consistently interpreted Section 206(a) of the

statute to include a prompt payment requirement.  *See* 29 U.S.C. § 206(a); *see also, e.g.*,

*Rogers v. City of Troy, N.Y.*, 148 F.3d 52, 57 (2d Cir. 1998) ("it is clear that the FLSA requires

wages to be paid in a timely fashion"); *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d

487, 491 (2d Cir. 1960) ("While the FLSA does not expressly set forth a requirement of prompt

payment, such a requirement is clearly established by the authorities . . . ."); *Rigopoulos v.

Kervan*, 140 F.2d 506, 507 (2d Cir. 1943) ("[The FLSA overtime provision] plainly

contemplates that overtime compensation shall be paid in the course of employment and not

accumulated beyond the regular payday.").  For its part, the statutory language of the NYLL

specifically addresses timing of payment of wages:  employers must make payments of wages

timely, *see* N.Y. Labor L. § 191(1), and clerical and other workers must be paid "in accordance

with the agreed terms of employment, but not less frequently than semi-monthly, on regular pay

days designated in advance by the employer."[14]   N.Y. Labor L. § 191(1)(d).  After a worker's

employment is terminated, the employer "must pay the wages not later than the regular pay day

for the pay period during which the termination occurred."  *Id.* § 191(3).

Plaintiff here alleges that he "never received [his] payroll check in a timely manner, or in

the correct amount," as Defendant "had the habit of paying [him] with bounced checks."

(Compl., at 3, 8.)  This allegation appears to encompass at least three interrelated problems with

Plaintiff's pay.  He appears to be alleging that (1) he was regularly unpaid, or underpaid, by

Defendant (*i.e.*, that Defendant did not pay him the agreed-upon (*i.e.*, "correct") amount for

which Plaintiff was to be paid for his work); (2) Defendant often delayed in providing his

paychecks; and (3) many of the paychecks provided by Plaintiff bounced, thereby causing further

underpayment or delay in payment.

Accepting these allegations as true, and drawing all reasonable inferences in favor of

Plaintiff, this Court understands that, on at least some occasions, Defendant failed to pay

Plaintiff at all for some of the hours he worked, in violation of the minimum wage requirements

set forth by both the FLSA, *see* 29 U.S.C. § 206(a)(1), and the NYLL, *see* N.Y. Labor L.

§ 652(1).  In addition, to the extent Defendant delayed making payments to Plaintiff, either by

failing to issue him paychecks on a regular basis or by issuing checks that were returned for

insufficient funds, Defendant failed to comply with the FLSA's prompt payment requirement,

*see* 29 U.S.C. § 206(a), and similarly failed to pay Plaintiff "in accordance with the agreed terms

of employment," in violation of Section 191(1)(d) of the NYLL.  Accordingly, Plaintiff's

allegations are sufficient to establish Defendant's liability under the FLSA and NYLL, both for

---

[14] The NYLL also contains specific provisions regarding the frequency of pay for manual workers, railroad workers, and commission salespersons.  *See* N.Y. Labor L. § 191(1)(a)-(c).

unpaid wages and for late payments made to Plaintiff as a result of delayed or bounced payroll checks.[15]

### D.   Retaliatory Discharge in Violation of Labor Laws

While Plaintiff did not explicitly plead retaliatory discharge in violation of federal and state labor laws, the facts alleged in his Complaint potentially give rise to such claims and therefore merit consideration by this Court.  Under the FLSA, an employer may not "discharge or in any other manner discriminate against an employee because such employee has filed a complaint or instituted any proceeding under [the FLSA] . . . ."  29 U.S.C. § 215(a)(3).  In order to establish a *prima facie* case of retaliation under the FLSA, a plaintiff must show "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action."  *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 472 (S.D.N.Y. 2008) (internal quotation marks and citation omitted).  The Second Circuit has held that making a complaint to one's own employer, as opposed to making a complaint to a government agency, is not a "protected activity" within the meaning of the FLSA.  *Lambert v.*

---

[15] The same allegations of unpaid or delayed wages could also be construed to state a claim for breach of contract under New York law, which requires:  (1) the existence of a contract; (2) the performance of that contract by one party; (3) the breach of that contract by the other party; and (4) damages.  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000).  Even if Plaintiff was an "at will" employee, this would not mean that Defendant had not agreed to pay him a certain wage, on a timely basis, for hours worked.  *See Arbeeny v. Kennedy Executive Search, Inc.*, 893 N.Y.S.2d 39, 44-45 (1st Dep't 2010).  As Plaintiff, however, cannot recover for the same harm twice, and as any injury suffered by Plaintiff as the result of any breach of an agreement by Defendant to make timely payments of his earned wages would be the same injury as Plaintiff would have suffered for non-payment or late payment of wages, in violation of either the anti-discrimination laws or the labor laws, this Court does not recommend engaging in a separate analysis of Plaintiff's potential contract damages.

*Genesee Hosp.*, 10 F.3d 46, 55 (2d Cir. 1993), *abrogated on other grounds by Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325 (2011).

The NYLL's anti-retaliation provision is somewhat broader in scope than the FLSA's. Under the NYLL, an employer may not retaliate against any employee, including by discharging the employee, because "such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter." N.Y. Lab. L. § 215(1)(a)(i). A plaintiff must plead that "while employed by the defendant, [the plaintiff] made a complaint about the employer's violation of the law and, as a result, was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action." *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 302 (S.D.N.Y. 2011).

Plaintiff's factual allegations are sufficient to make out a retaliation claim under the NYLL, but not under the FLSA. While Plaintiff here has alleged that, in December 2011, he complained to the Department of Labor that Defendant had issued him paychecks without sufficient funds "on several occasions" (Compl., at 9), he has not alleged that Defendant had any knowledge of this complaint, nor has he pleaded facts from which this Court could infer such knowledge. Plaintiff, therefore, has not established that he engaged in a "protected activity *known to the defendant*" *Torres*, 628 F. Supp. 2d at 472 (emphasis added), as required to state a retaliatory discharge claim under the FLSA.

Plaintiff has, however, established that he engaged in activity protected by the NYLL. Plaintiff alleges that, on December 30, 2011, he returned three bounced checks to Defendant and requested to be paid by certified check (Compl., at 9), and that his employment was terminated

very shortly thereafter, on January 2, 2012.  (*See id.*)  As internal complaints are explicitly

covered by the NYLL, *see* N.Y. Lab. L. § 215(1)(a)(i), Plaintiff's allegations are sufficient to

plead that he engaged in activity protected under that statute.  Further, the temporal proximity

between Plaintiff's internal complaint and the termination of his employment is sufficient to give

rise to an inference of a causal connection between the two.  *Cf. Jacques v. DiMarzio, Inc.*, 200

F. Supp. 2d 151, 162 (E.D.N.Y. 2002) (denying summary judgment where plaintiff's

employment was terminated within two weeks of her complaints to defendant of a labor law

violation).  Based on the substance of Plaintiff's well-pleaded allegations, this Court finds that he

has stated a claim for retaliatory discharge under the NYLL.[16]

## III.   DAMAGES

To summarize the above, Plaintiff has adequately pleaded a factual basis for claims that:

> (1)   by denying Plaintiff timely payment of wages, Defendant
> violated (a) relevant discrimination laws – including
> Title VII, the ADEA, the NYSHL (and, if the Complaint is
> construed to include it, the NYCHRL), and (b) the payment
> provisions of the FLSA and NYLL; and

---

[16] The Court notes that, at or before the commencement of an action under the NYLL, a
plaintiff is required to serve notice on the state attorney general, *see* N.Y. Labor L. § 215(2)(b),
and the record contains no indication that such notice was served in this case.  Last year, this
Court observed in another case that the New York Court of Appeals had not yet addressed the
question of whether this notice requirement is a "strict 'condition precedent' to suit," or may be
excused, *see Robledo v. Number 9 Parfume Leasehold*, No. 12cv3579 (ALC) (DF), 2013 WL
1718917, at *8 (S.D.N.Y. Apr. 9, 2013), and this Court concluded that a NYLL retaliation claim
should not be rejected solely on the basis of late notice, *see id.*; *but see Gonsalez v. Marin*, No.
12cv1157 (ENV) (RML), 2014 WL 2514704, at *8 (E.D.N.Y. Apr. 25, 2014) (recommending
that the court deny request for damages, without prejudice, and allow plaintiffs to submit proof
of service upon the attorney general within 14 days).  In any event, in the case now before the
Court, it would appear that Defendant, by its default, has forfeited any argument that Plaintiff
failed to serve the required notice on the attorney general.  Especially in this circumstance, I
recommend that the Court proceed to consider damages in connection with Plaintiff's well-
pleaded allegations that Defendant terminated his employment in retaliation for activity
protected under the NYLL.

> (2)     by terminating Plaintiff's employment in retaliation for his
>         internal complaint regarding the fact that he was "paid"
>         wages with checks that bounced, Defendant violated the
>         NYLL.

As also discussed above, however, while Plaintiff laid out a sufficient factual basis for each of these claims in his *pro se* Complaint, he did not necessarily specify each of their *legal* bases; indeed, he made no mention of any labor law in his pleading.  In the inquest context, this requires the Court to address the tension between its obligation to read a *pro se* complaint liberally to contain all causes of action suggested by the facts raised, *Soto*, 44 F.3d at 170, and its obligation under Rule 54(c) to ensure that a defaulting defendant has received proper notice of the damages that may be awarded against it, so as to be able to make an informed decision as to whether to defend the suit.  While, in awarding damages on default judgments, courts have strictly construed the *ad damnum* clauses of complaints (*see supra* at Section I(B)), it is this Court's view that applying too narrow a reading of a Plaintiff's pleading here would be inappropriate, as a *pro se* plaintiff should not lose the benefit of a liberal construction of his complaint simply because the defendant has chosen not to appear.  Where the facts alleged in a *pro se* complaint are sufficiently clear to put the defendant on notice that a cause of action not explicitly stated may be fairly implied, a defaulting defendant risks being held liable for damages on those claims.

In this case, it should again be stressed that, although Plaintiff did not explicitly plead claims under the FLSA and NYLL, the Complaint clearly – and indeed primarily – alleges facts regarding compensation sufficient to provide Defendant with the requisite notice.  In particular, Plaintiff complains that he "never received [his] payroll check in a timely manner, or in the correct amount," that he "did report that to the [Department] of Labor," and that "later on [he]

was fired." (Compl., at 3.) As the Complaint thus plainly alleges labor law violations, this Court

concludes that Defendant was on adequate notice that damages could be awarded on such

claims.[17] In addition, and as explained further below, given that the types of damages

recommended here are all available under the various statutes that Plaintiff *did* invoke, the

recommended damages (even including certain liquidated damages), should not be found, in this

particular case, to "differ in kind" from the relief demanded in the Complaint.

This Court does note, however, that the damages that it is recommending on Plaintiff's

well-pleaded claims are less than what Plaintiff seeks, in large measure because the

documentation he has submitted in support of his damages does not demonstrate the

reasonableness of the amounts requested. While this Court is sensitive to Plaintiff's assertion

that it has been "tremendously difficult" for him, acting *pro se* and without the benefit of

discovery, to piece together his payment history (*see* Dkt. 28 at 1) and otherwise present his

evidence, this does not relieve him of his burden to demonstrate the damages due to him with

"reasonable certainty," *Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d

105, 111 (2d Cir. 1997). Despite being given three separate opportunities to explain and

substantiate his claims for damages – through two written submissions, and through evidence

taken by the Court at the inquest hearing – Plaintiff has provided only piecemeal and confusing

documentation with minimal explanation, and only the very vaguest of testimony. Several of the

payment documents that Plaintiff has submitted are incomplete or duplicative. Other documents

he has provided to the Court appear to be simply irrelevant, and Plaintiff has not offered any

explanation as to why they should be viewed as having any bearing on his claim for damages.

---

[17] Defendant is also being provided with further notice through this Report and
Recommendation, to which it will have the opportunity to object.

Given the disorganized manner in which Plaintiff has presented copies of his payment documentation, including paychecks, stubs, and check backs – out of chronological sequence, photocopied with some documents overlaying others, cut off, or even upside down – this Court has undertaken to create its own chart summarizing these documents, as best as the Court is able to discern their contents.  This chart is attached to this report as Exhibit A, and will be referred to herein as "Court Ex. A."  On it, the Court has listed, where ascertainable, (a) the workweek for which payment was made (*i.e.*, the "week ending" date), (b) the date of the check, (c) the length of any delay between a and b, (d) the check number, (e) the check amount (*i.e.*, Plaintiff's pay, net of any withholding), (e) the type of document (*i.e.*, copy of a check, or an apparent check stub or back of a check), (f) any potentially relevant notation on the document (such as a notation indicating that the check had been returned for insufficient funds, or was a "replacement" check),[18] and (g) the location where the document may be found in the record (*i.e.*, the Docket and page numbers).  (*See* Court Ex. A.)  While this chart does reveal some basis for an award of damages for Defendant's late payments of wages to Plaintiff, the evidence falls far short of supporting Plaintiff's allegations regarding the frequency or extent of Defendant's unlawful conduct.

A.    **Damages for Unpaid and Late Wages**

Plaintiff has stated claims relating to unpaid and/or late wages under both the discrimination laws (where he couches the claim in terms of disparate treatment) and the labor laws.  While compensatory damages are available under both types of statutes, the discrimination

---

[18] The Court has used gray shading to highlight those checks bearing notations suggesting that the checks bounced, and also those checks bearing notations suggesting that they were issued as "replacements" for bounced checks.

laws and the NYLL typically allow for an award of "actual damages" to compensate a plaintiff for the harm demonstrably resulting from the defendant's unlawful practices, *see* 42 U.S.C. § 1981a(a)(1); 29 U.S.C. § 626(b); N.Y. Exec. L. § 297(9); N.Y. Lab. L. § 198-a, whereas the FLSA, as explained further below, allows for compensation in the form of liquidated damages, *see* 29 U.S.C. § 216(b).[19]  As Plaintiff should not recover twice for the same injuries, nor be awarded damages different in kind from those sought in the Complaint, see Fed. R. Civ. P. 54(c), this Court will first assess the harm that Plaintiff has demonstrated and then address how damages should be awarded, so as to be consistent with both his pleading and the relevant statutes.

### 1.     Unpaid Wages

Based on Plaintiff's claim that, during the period of his employment, Defendant never compensated him at all for at least some of his work, Plaintiff is certainly entitled to recover, at a minimum, the amount of any unpaid wages that he can establish with reasonable certainty.  In response to this Court's request for documentation of his damages, however, Plaintiff submitted, without explication, a hodgepodge of documents, from which this Court has been largely unable to discern the extent to which he was not paid for work he performed.

---

[19] The NYLL also allows for liquidated damages for unpaid (but not late-paid) wages, *see* N.Y. Lab. L. § 198(1-a), but at least some courts have suggested that such damages under the New York law should be viewed as punitive, rather than compensatory, *see, e.g*., *Carrasco v. W. Vill. Ritz Corp.*, 11cv7843 (DLC), 2012 WL 3822238, at *2 (S.D.N.Y. Sept. 4, 2012) (citation omitted); *Wicaksono v. XYZ 48 Corp.*, 10cv3635 (LAK) (JCF), 2011 WL 2022644, at *7 (S.D.N.Y. May 2, 2011) *report and recommendation adopted*, 2011 WL 2038973 (May 24, 2011).

.

For instance, while Plaintiff's submission of paychecks contains gaps, suggesting that there may have been periods of time when he worked, but received no pay (*see* Court Ex. A), Plaintiff has never stated as much.  Rather, the Court is left to speculate as to whether a gap in the submission means that Plaintiff was not paid, or that he just could not locate the documentation of his payments for the missing periods of time.  Although, from the spreadsheet he provided, it appears that Plaintiff would have this Court believe that he typically received only one paycheck every five weeks and was therefore paid only $7,983 over the course of his three years of employment with Defendant (*see* Dkt. 28 at 4), even the incomplete documentary evidence he has presented appears to contradict this assertion (*see* Court Ex. A; Dkts. 17, 17-1 (demonstrating that, during some periods, Plaintiff received paychecks each week)).  Thus, the Court cannot credit this bare allegation.

Similarly, this Court is left to guess as to the extent to which Plaintiff was paid with checks that bounced and that were not replaced with reissued checks that then cleared.  The documentation that Plaintiff submitted prior to the hearing seems to show, at most, eight checks that were returned by a bank (*see* Court Ex. A, at 1:12-14, 2:3, 2:9, 2:11, 3:2, 3:6), but, of those, one was not even made out to Plaintiff (*see id.* at 1:13 (check made out to "Avenue Check Cashing Corp.")).  Of the rest, it appears that Defendant eventually did issue replacement checks for at least four, covering the amounts of the original checks, plus incurred fees.  (*See id.* at 2:3, 2:5 (returned check dated July 12, 2011, apparently replaced July 21, 2011); 2:9, 2:11, 2:13 (returned checks dated August 15, 2011 and September 14, 2011, apparently replaced September 23, 2011); and 3:2, 3:5 (returned check dated November 8, 2011, apparently replaced November 30, 2011).)  As to the remaining three returned checks (*id.* at 1:12, 1:14, 3:6), the record is silent as to whether Defendant ever similarly repaid the amounts due, and, given the

33

number of gaps in the record, this Court cannot merely assume that the absence of documentation means that repayment was not made.[20]

As the record does not demonstrate, to any degree of certainty, the amount of wages owed to Plaintiff due to Defendant's alleged "habit" of "paying [him] with bounced checks" and failure to pay "in the correct amount" (Compl., at 9), this Court does not recommend any award of damages on Plaintiff's claim for unpaid wages under either the discrimination or labor laws.

### 2.    **Late-Paid Wages**

The documentation submitted by Plaintiff shows a bit more certainty in terms of occasions when his pay was delayed.

First, even though the Court is unable to determine whether Plaintiff was eventually repaid for every paycheck that bounced, there would seem to be no doubt that, at a minimum, he suffered a *delay* in payment whenever one of his paychecks was returned by a bank, whether for insufficient funds or some other deficiency.  As noted above, the record shows evidence of seven such paychecks, made out to Plaintiff and returned by a bank (Court Ex. A, at 1:12, 1:14, 2:3, 2:9, 2:11, 3:2, 3:6), and Plaintiff should at least be awarded damages sufficient to compensate him for injuries incurred as a result of that delay.

---

[20] At the inquest hearing, Plaintiff confirmed that, when checks bounced, Defendant did, at least on some occasions, issue replacement checks (Tr., at 10 (Plaintiff testifying that "when . . . the check don't have sufficient fund[s], most of the time they wait like six weeks in order to give you another check")), although he also testified that, sometimes, those checks also bounced (*id.*).  In his testimony, however, Plaintiff seemed uncertain as to which of the paychecks he had submitted represented bounced checks or checks on which he was never paid. (*See, e.g.*, Tr., at 54 ("Q. How can I tell from looking at this whether it was bounced or didn't bounce?  A. . . . I don't know . . . I have to compare it with the check.").)  In his post-hearing submission, Plaintiff then failed to address the issue at all, leaving the record unclear as to when he was repaid for bounced checks, and when he was not.

Second, the record shows that Plaintiff was not paid on a regular payday, but rather that the length of time between the end of his workweek and the issuance of his paycheck for that workweek varied widely, and at times stretched to 17, 19 – or, on one occasion – even to 38 days.  (*See id*. at 1:9, 3:3, 3:4.)  In this Court's view, a delay of more than two weeks between the end of a weekly pay period and the issuance of a paycheck is unreasonable, and Plaintiff's submissions demonstrate five instances of this.  Regardless of whether this delay was occasioned by discriminatory animus or was simply a violation of the labor laws, *see* 29 U.S.C. § 206(a); N.Y. Labor L. § 191(1)(d), Plaintiff should again be awarded compensatory damages for the delay.

The measurement of such damages, however, is difficult, as Plaintiff has not set out evidence of actual loss he suffered as a result of the delays in payment.  While he seems to argue that delays in receiving his paychecks made him unable to pay his rent (*see* Dkt. 28 at 4), he testified that he was not evicted from his apartment, but instead made arrangements with his landlord to pay in installments (Tr., at 61:11-25), and the rent receipts he has submitted appear to substantiate this (*see* Dkt. 28 at 5-12).  What damage he suffered in this regard is therefore unclear.  On the other hand, awarding Plaintiff only interest on the late payments – so as to compensate him merely for the lost time-value of money, *see*, *e.g.*, *Calderon v. Witvoet*, 999 F.2d 1101, 1108 (7th Cir. 1993), would seem to undervalue the impact that a delayed payment of wages would likely have on a low-income wage earner.

In this instance, where the damages resulting from Defendant's delay in payment are particularly "difficult of proof for estimate," *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 584 (1942), this Court recommends adopting the approach set out in the FLSA for calculating Plaintiff's compensatory damages.  Whereas the typical disparate-treatment

discrimination case does not involve an employer who intentionally delays a worker's wages, such that there is little – if any – on-point authority for estimating damages flowing from such discriminatory conduct, the FLSA provides insight into a way in which damages may be reasonably estimated in the type of factual scenario presented here.  Specifically, I recommend that the Court look to Section 216(a) of the FLSA, which has been construed to offer a specific compensatory remedy for the untimely payment of wages.

Section 216(a) of the FLSA provides, in relevant part, that an employer who violates the statute (including by failing to make timely payment of wages), "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages . . . and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(a).  Under the statute, "late" wages are considered to be a form of "unpaid" wages, *see Rigopoulos v. Kervan*, 140 F.2d 506, 507 (2d Cir. 1943); *Rogers v. City of Troy, N.Y.*, 148 F.3d 52, 58 (2d Cir. 1998),[21] but, where wages have merely been paid late, as opposed to not having being paid at all, courts have construed Section 216(a) to mean that only liquidated damages (rather than double damages) should be awarded, as reasonable compensation for harm occasioned by, in particular, the delay component of the defendant's unlawful pay practices, *see, e.g.*, *Calderon v. Witvoet*, 999 F.2d 1101, 1108 (7th Cir. 1993).[22]

---

[21] While "what constitutes timely payment [under the FLSA] must be determined by objective standards," *Rogers*, 148 F.3d at 57, the Second Circuit has not provided a specific, objective framework under which to analyze such claims.  As Defendant in this case has defaulted and waived any opportunity to explain its conduct, this Court finds the bounced checks and other paychecks delayed for more than two weeks to be objectively late within the meaning of the FLSA.

[22] The NYLL does not appear to provide a similar remedy.  While it also contains a liquidated damages provision, it seems that the provision is geared to afford relief for unpaid wages, not for late-paid wages.  *See* N.Y. Labor L. § 198(1-a).

It is well established that such liquidated damages are meant to be compensatory, not punitive.  *See*, *e.g.*, *Overnight Motor*, 316 U.S. at 583-84 ("The liquidated damages for failure to pay the minimum wages . . . are compensation, not a penalty or punishment by the Government . . . .  The retention of a workman's pay may well result in damages too obscure and difficult of proof for estimate other than by liquidated damages."  (citations omitted)); *see also Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945) ("[T]he liquidated damage provision is not penal in nature but constitutes compensation for the retention of a workman's pay . . . ." (citing *Overnight Motor,* 316 U.S. at 583)).[23]

Here, the seven demonstrated instances of bounced checks, as well as the five demonstrated instances of Plaintiff's wages simply being delayed more than two weeks after the end of the workweek in question, all occurred after July 24, 2009, and thus during the period in time where the applicable minimum wage was $7.25 per hour.  Of those 12 total instances of late wages, four occurred during the time when Plaintiff was working five days (or 37.5 hours) per week (resulting in liquidated damages of $1,087.50),[24] and the other eight occurred during the

---

[23] In fact, even though Congress amended the FLSA in 1947 to give courts discretion to reduce or deny a liquidated damages award where an employer demonstrates that its unlawful conduct was in "good faith" or that it had "reasonable grounds for belie[ving]" its conduct was lawful, *see* 29 U.S.C. § 260, the Second Circuit has continued to describe the liquidated damages provision as compensatory in nature, *see*, *e.g.*, *U.S. v. Sabhani*, 599 F.3d 215, 260 (2d Cir. 2010) ("The possibility that a judge may in narrow circumstances relieve an employer of its obligation to pay alters neither Section 216's general command that liquidated damages be paid nor our repeated recognition that these damages count as compensation."  (citations omitted)); *see also Rogers*, 148 F.3d at 55.

[24] 4 x 37.5 x $7.25 = $1,087.50.

time when Plaintiff was working four days (or 30 hours) per week (resulting in liquidated damages of $1,740).[25]

I therefore recommend that, under the FLSA, Plaintiff be awarded liquidated damages in the amount of $2,827.50, as compensation for Defendant's failure to pay him on a timely basis, during the period of his employment. As such liquidated damages under the FLSA are designed to be compensatory and not punitive, they would not differ in kind from the types of make-whole damages permitted under the anti-discrimination statutes referenced in Plaintiff's Complaint. As interest should not be added, though, to an award of liquidated damages under Section 216(a) of the FLSA, *see Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988) (citing *Brooklyn Sav. Bank*, 324 U.S. at 714-16), I do not recommend that interest be awarded on this sum.

### B. Damages for Retaliatory Discharge

The NYLL makes broad remedies available in retaliation cases. Under the NYLL, a court may "order all appropriate relief," including injunctive relief, equitable relief, and "an award of lost compensation and damages." N.Y. Lab. L. § 215(2)(a). The NYLL further directs that "[t]he court shall award liquidated damages to every employee aggrieved under this section, in addition to any other remedies permitted by this section," up to $10,000. *Id.*

Here, although Plaintiff mentions injunctive relief generally in his pleading (*see* Compl., at 4; Belizaire Aff., at 3), he appears to seek only monetary damages, as he has not indicated a wish to be reinstated in his former job or otherwise specified any particular form of injunctive relief that he desires. Instead, he indicates that he seeks $259,493 in damages for retaliation. (*See* Dkt. 28 at 4.) In determining the amount of any monetary award to which Plaintiff may be

---

[25] 8 x 30 x $7.25 = $1,740.00.

entitled for retaliatory discharge under the NYLL, this Court will separately consider the potential remedies of back pay, prejudgment interest, liquidated damages, compensation for benefits allegedly lost as the result of Plaintiff's termination, and emotional distress damages.[26] Before doing so, however, this Court will first review the monetary remedies available under the statutes explicitly referenced in Plaintiff's Complaint to ensure that the recommended relief does not differ in kind from the relief that Defendant could have fairly anticipated from Plaintiff's pleading.

### 1.  Remedies Available Under Statutes Invoked by Plaintiff

Although each of the anti-discrimination statutes explicitly referenced by Plaintiff in his Complaint provides for broad relief, each remedial scheme is distinct.  While the referenced federal statutes authorize, in different respects, compensatory and punitive measures, the NYSHRL offers compensation but does not provide for any penalty.

Title VII allows for monetary relief in the form of back pay, 42 U.S.C. § 2000e-5(g)(1), damages for emotional suffering and other nonpecuniary losses, 42 U.S.C. § 1981a(b)(3), and, in cases involving intentional discrimination, punitive damages, 42 U.S.C. § 1981a(b)(1).[27]

---

[26] As, in this Court's view, liquidated damages under the anti-retaliation provisions of the NYLL are punitive in nature, a separate award for punitive damages would be duplicative. Although some courts have found that separate punitive damages are nonetheless available under the NYLL's anti-retaliation provisions, *see, e.g., Ting Yao Lin v. Hayashi Ya II, Inc.*, 2009 WL 289653, at *8 (S.D.N.Y. Jan. 30, 2009); *Perez v. Jasper Trading, Inc.*, No. 05cv1725 (ILG) (VVP), 2007 WL 4441062, at *7 (E.D.N.Y. Dec. 17, 2007), these cases were decided before the NYLL was amended, mandating the award of liquidated damages in cases of retaliation, *see* 2010 Sess. Law News of N.Y. Ch. 564 (S. 8380).

[27] The statute caps liability for "future pecuniary losses," "nonpecuiniary losses" including emotional distress, and punitive damages at a total of $50,000 for employers of 15 to 100 employees, $100,000 for employers of 101 to 200 employees, $200,000 for employers of 201 to 500 employees, and $300,000 for employers with 501 or more employees.  42 U.S.C. § 1981a(b)(3).

The ADEA authorizes courts to "grant such legal or equitable relief as may be appropriate to effectuate [its] purposes," including back pay, and, in cases of willful violations, liquidated damages equal to the amount of any back pay award.  29 U.S.C. § 626(b).  Unlike Title VII, however, the ADEA does not allow for an award of punitive damages (other than liquidated damages, which are considered punitive, *see Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125 (1985)) or damages for emotional distress.  *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143, 147 (2d Cir. 1984) (allowing for recovery of emotional distress and punitive damages in litigation would "deter [aggrieved parties] from fully participating in the ADEA's administrative conciliation scheme . . . .").

Prejudgment interest on back pay is available under both Title VII and the ADEA, and is generally awarded, *Loeffler v. Frank*, 486 U.S. 549, 557-58 (1988), absent a procedural delay occasioned by Plaintiff, *see, e.g., Goodman v. Heublein, Inc.*, 682 F.2d 44, 45(2d Cir. 1982) (reversing award of prejudgment interest accrued during, *e.g.,* pendency of appeal, where plaintiff failed to move for the award within the 10-day time limit).  Interest on back pay may be awarded even when a punitive award (punitive damages under Title VII, or liquidated damages under the ADEA) is made.  *See Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252 (S.D.N.Y. 2007) (Title VII); *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 282 (2d Cir. 1987) (ADEA).

Under the NYSHRL, a court may award damages and "such other remedies as may be appropriate," although punitive damages are not available in employment discrimination cases. N.Y. Exec. L. § 297(9).  The statute allows for both back pay and emotional distress ("mental anguish") damages, *see, e.g., Mittl v. New York State Div. of Human Rights*, 794 N.E.2d 518, 520 (N.Y. 2003), as well as prejudgment interest on back pay as a compensatory measure,

40

*Aurecchione v. New York State Div. of Human Rights*, 771 N.E.2d 231, 234 (N.Y. 2002).  Unlike Title VII (*see* n.27, *supra*), the NYSHRL does not set a cap on damages for non-pecuniary harm such as emotional distress.

### 2.   Back Pay

As noted above, a plaintiff who demonstrates retaliatory discharge under the NYLL is entitled to "lost compensation," N.Y. Labor L. § 215(2)(a), and, as would be true under each of the statutes invoked by Plaintiff in his pleading, such compensation would include back pay. *See, e.g.*, *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 144-45 (2d Cir. 1993) (in context of Title VII, observing that a plaintiff who prevails on a claim of retaliatory discharge is "ordinarily entitled to an award of back pay from the date of [his] termination until the date of judgment," the purpose of which is "to completely redress the economic injury the plaintiff has suffered as a result of [retaliatory discharge]" (internal quotation marks and citations omitted)).  In the inquest context, courts in this jurisdiction generally award back pay through the date of default judgment.  *See*, *e.g.*, *Manson v. Friedberg*, No. 08cv3890 (RO), 2013 WL 2896971, at *6 (S.D.N.Y. June 13, 2013); *Becerril v. E. Bronx NAACP Child Dev. Ctr.*, No. 08cv10283 (PAC) (KNF), 2009 WL 2611950, at *3 (S.D.N.Y. Aug. 18, 2009), *report and recommendation adopted*, 2009 WL 2972992 (Sept. 17, 2009).

Plaintiff's salary at the time of his termination was approximately $240 per week,[28] and his employment was wrongfully terminated on January 2, 2012, when he was told to leave his work site.  (*See* Compl., at 9.)  Ordinarily, then, Plaintiff would be entitled to back pay from that date forward.  In this instance, though, it would be appropriate to back up, by one week, the start

---

[28] 4 days/wk. x 7.5 hrs./day x $8.00/hr. = $240/wk.

41

of the period for which back pay should be calculated, as Plaintiff testified that he received no wages after his last day on the job (*see* Tr., at 39), which was a Monday, and the documentary evidence shows that there was consistently a lag of at least five days between the typical Sunday close of a weekly pay period and Defendant's issuance of a paycheck.  (*See* Court Ex. A.)  Given this demonstrated pattern, this Court finds that Plaintiff has established with reasonable certainty that he was not paid for his final week on the job, warranting a concomitant adjustment in a back pay award.

Plaintiff's submission of a letter indicating that, at some point, he realized monthly earnings from another source (Dkt. 28 at 3) raises the issue of whether any award of back pay must be set off by interim earnings.  New York state courts have not yet addressed the issue of whether an award for back pay under the NYLL anti-retaliation provisions must be offset by interim earnings.  In the related FLSA context, while at least one circuit has determined that interim earnings should be deducted from an award of back pay for retaliatory discharge, *E.E.O.C. v. White and Son Enterprises*, 881 F.2d 1006, 1013 (11th Cir. 1989), the Second Circuit has yet to address this issue.  Given that Defendant has chosen not to appear in this proceeding and has therefore waived any defense regarding Plaintiff's interim earnings, this Court chooses to resolve this uncertainty in the law in favor of Plaintiff and does not recommend that an award of back pay be reduced by interim earnings.

As awarding Plaintiff back pay under the NYLL would not run afoul of Rule 54(c) (given that, as described in ¶ 1, *supra*, back pay is available under *all* of the statutes that Plaintiff referenced in his pleading), this Court recommends that such an award be made.  Specifically, I recommend that, on his claim of retaliatory discharge for complaining of labor law violations, Plaintiff be awarded his "lost compensation" in the amount of $240 per week for each week from

December 26, 2011 – one week before his termination – through June 19, 2013, the date of entry of default judgment against Defendant.  Accordingly, this Court recommends that Plaintiff be awarded $18,552.00 in back pay.[29]

### 3.   Prejudgment interest

This Court also recommends that prejudgment interest be added to any back pay award. *See Sharkey v. Lasmo*, 214 F.3d 371, 375 (2d Cir. 2000) ("[T]o the extent . . . that the damages awarded to the plaintiff represent compensation for lost wages, it is ordinarily an abuse of discretion not to include pre-judgment interest."  (internal quotation marks and citation omitted)); *Kuper v. Empire Blue Cross & Blue Shield*, No. 99cv1190 (JSG) (MHD), 2003 WL 23350111, at *2 (S.D.N.Y. Dec. 18, 2003), *report and recommendation adopted,* 2004 WL 97685 (Jan. 20, 2004); *Aurecchione*, 771 N.E.2d at 234 ("The denial of pre-determination interest here would be tantamount to an 'interest-free loan' to [the employer]."  (citation omitted)).

The applicable statutory interest rate in New York is nine percent per annum.  *See* C.P.L.R. § 5004; *Ting Yao Lin v. Hayashi Ya II, Inc.*, No. 08cv6071 (SAS) (AJP), 2009 WL 289653, at *7 (S.D.N.Y. Jan. 30, 2009), *report and recommendation adopted sub nom. Yao Lin v. Hayashi Ya II, Inc.*, 2009 WL 513371 (Feb. 27, 2009) (awarding nine percent interest on unpaid wages under the NYLL).  New York law permits interest on damages incurred over a period of time to be calculated from "the date [damages were] incurred or upon all of the damages from a single reasonable intermediate date."  C.P.L.R. § 5001(b).  This prejudgment interest accrues until "the date the verdict was rendered," and is then "included in the total sum

---

[29] $240/wk x 77.3 weeks = $18,552.00

awarded." *Id*. § 5001(c).  Interest then continues to accrue on the "total sum awarded, including interest to verdict, report, or decision, . . . to the date of entry of final judgment." *Id.* § 5002.

This Court finds that, in this case, a "reasonable intermediate date" would be September 21, 2012 – the midpoint between December 26, 2011, and the entry of default judgment on June 19, 2013.  *See Maldonado v. La Nueva Rampa, Inc.*, No. 10cv8195 (LLS) (JLC), 2012 WL 1669341, at *11 (S.D.N.Y. May 14, 2012) (recommending that interest be calculated from midpoint of employment period where NYLL violations occurred throughout the course of employment).  The interest accrued on the recommended award of back pay through the entry of default judgment, *see* C.P.L.R. § 5001, would therefore equal $1,239.68.[30]  In accordance with C.P.L.R. § 5002, interest should continue to accrue on the "total sum" of $19,761.68[31] from June 19, 2013 through the date of entry of final judgment.

As prejudgment interest is available under all of the statutes Plaintiff invoked in his pleading (*see* ¶ 1, *supra*), an award of such interest here would not differ in kind from the relief demanded in the Complaint.  Accordingly, this Court recommends that Plaintiff be awarded prejudgment interest in the amount of $1,239.68 pursuant to C.P.L.R. § 5001, and an additional award pursuant to C.P.L.R. § 5002 to be calculated as interest at the rate of nine percent per annum on the sum of $19,761.68 from June 19, 2013 through the date of entry of final judgment.

### 4.   Liquidated Damages

A court finding retaliatory discharge in violation of the NYLL "shall award liquidated damages to every employee aggrieved under this section, in addition to any other remedies

---

[30] $18,552 principal x .09 rate of interest x (271 days / 365 days per year) = $1,239.68

[31] $18,522.00 + $1,239.68 = $19,761.68

permitted by this section," up to $10,000.  N.Y. Lab. L. § 215(2)(a).  In analyzing the NYLL's

provision authorizing liquidated damages for unpaid wages, the Second Circuit has found that

such damages are punitive in nature, and that they may therefore be awarded concurrently with

prejudgment interest.  *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 265 (2d Cir. 1999).

In this Court's view, liquidated damages under the anti-retaliation provisions of the NYLL are

also punitive in nature, given that they flow from a willful retaliatory act, and so, in accordance

with *Reilly,* such damages may also be awarded concurrently with prejudgment interest.  *See*

*Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 282 (2d Cir. 1987)

(prejudgment interest may be awarded concurrently with liquidated damages under the ADEA,

as "liquidated damages under the ADEA are punitive in nature").

As the federal statutes invoked in Plaintiff's Complaint also provide for punitive damages

(in the form of liquidated damages under the ADEA and separate additional damages under

Title VII), an award of punitive damages here would not violate Rule 54(c).  Accordingly,

I recommend that, on his NYLL retaliation claim, Plaintiff be awarded liquidated damages in the

amount of $10,000.

### 5.   Lost Benefits

Plaintiff also requests damages for a variety of benefits purportedly lost upon his

termination, including $768.30 for sick days, $1,536.60 for vacation pay, $250 for Social

Security benefits, and $39,951.60 for severance.[32]  (*See* Dkt. 28 at 4.)  Even accepting that these

_____

[32] As Plaintiff has not alleged any facts related to the purportedly discriminatory denial of sick days, social security, or severance benefits in the Complaint, this Court understands these issues to constitute possible categories of damages flowing from Plaintiff's unlawful termination, as opposed to the bases of separate substantive claims.  (*See* Compl.; *see also* Belizaire Aff., at 1 (stating that "severance pay, holiday pay, back pay, sick days, break time, and annual vacation were not received after being discharged").)

45

benefits could fairly be considered part of "lost compensation" within the meaning of Section 215(2)(a) of the NYLL, Plaintiff has not demonstrated their value to a reasonable certainty. Although Plaintiff testified that, during the period of his employment, he was denied permission to take sick days on two or three occasions (*see* Tr., at 26), the record contains no specific evidence to support this, and similarly contains no evidence regarding any corporate severance policy, from which the Court could determine the amount of any severance owed.[33]  While Plaintiff lists, on his spreadsheet, an amount of lost severance pay in an amount equal to three years of his annual net pay (*see* Dkt. 28, at 4 (itemizing lost severance pay as $39,951.60)), the implied assertion that this was actually the amount due to him is too conclusory for this Court to accept.  Moreover, Plaintiff's claim to severance pay appears to be in some tension with the award for back pay recommended by this Court.  *Cf. Georgeson & Co., Inc. v. Stewart*, 700 N.Y.S.2d 9, 10 (1st Dep't 1999) (confirming administrative agency decision awarding claimant back pay from the date on which her severance payments ended).

Plaintiff further claims that Defendant's retaliation against him included unfairly obstructing him from obtaining *public* benefits, including cash assistance and rental assistance. (Tr., at 30-31; Dkt. 28 at 4.)  Plaintiff included, among his submissions, a copy of his application for assistance from the Human Resources Administration, and he testified that this application was denied because Defendant misrepresented to the agency that Plaintiff was still employed, when he had actually already been terminated.  (Tr., at 32.)  Even if erroneous information

---

[33] The record also contains no evidence that Plaintiff was subjected to disparate treatment with respect to either sick pay or severance, such that the denial of either could stand alone as the basis for a discrimination claim.  (*See, e.g.*, Tr., at 22 (Plaintiff testifying, in response to question as to whether other employees received sick days, "Well, I don't know about them because I know what they do about me."); *id*. at 32 (Plaintiff testifying, with respect to other employees, "I don't know if people pay severance.").)

supplied by Defendant did cause the agency to deny Plaintiff's application for benefits, this Court cannot determine, on the record before it, the amount of any benefits that Plaintiff should have received.  Accordingly, this Court does not recommend the award of any damages for benefits lost upon Defendant's termination of Plaintiff's employment.

### 6.   <u>Emotional Distress Damages</u>

The NYLL does not specifically list emotional distress damages as a remedy available for unlawful retaliation, but it does authorize granting of "all appropriate relief," N.Y. Lab. L. § 215(2)(a), and courts have found emotional distress damages to be an appropriate award.  *See Perez v. Jasper Trading, Inc.*, No. 05cv1725 (ILG) (VVP), 2007 WL 4441062, at *7-10 (E.D.N.Y. Dec. 17, 2007).

Here, Plaintiff seeks damages for his "suffering."  (Compl., at 4.)  In his affidavit, Plaintiff states that, due to Defendant's retaliation, he "was unable to continue [his] legal studies and suffer[ed] from stress."  (Belizaire Aff., at 3.)  Plaintiff also submitted to the Court a letter from Dr. Kesler Dalmacy, dated May 9, 2014, in which the doctor wrote:

> Please be advised that [Plaintiff] is a patient at this office.  Based on his medical records, he suffered from a severe skin disorder, Depression and other health impairments.  Medical history suggests that it could be related to some harassment on the job.

(*See* Letter from Kesler Dalmacy, M.D., dated May 9, 2014 (Dkt. 28 at 2).)

At the inquest hearing, Plaintiff testified that "psychologically [he] didn't feel okay" after his employment was terminated (Tr., at 58), and that, about five or six months after he was fired, he went to a medical doctor who prescribed some medication (*see id.* at 60-61).  Plaintiff could not recall the name of the medication, but understood it to be "for stress."  (*Id.* at 61.)  Plaintiff also described that he felt "a little bit loss . . . of self-esteem" and "some distress" (*id.* at 62) due

to his difficulty in finding a new job, although he attributed his difficulty in that regard at least partially to his skin disorder (*see id.*).

Plaintiff's evidence supports an award of damages for so-called "garden-variety" emotional distress, which are "based primarily on the plaintiffs' description of mental anguish in somewhat general terms, [where] there is little or no evidence of medical treatment, and [where] there is little detail of the duration, severity, or consequences of the condition." *Reiter v. Metro. Transp. Auth. of New York*, No. 01cv2762 (JGK), 2003 WL 22271223, at *8-9 & n.4 (S.D.N.Y. Sept. 30, 2003). While "the award in a particular case must be seen in light of the facts and circumstances of that case," *Port Auth. Police Asian Jade Soc. of New York & New Jersey Inc. v. Port Auth. of New York & New Jersey*, 681 F. Supp. 2d 456, 469 (S.D.N.Y. 2010), courts in the Second Circuit have noted that garden-variety emotional distress claims generally range between $30,000 and $100,000, *see id*; *see also Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) ("Garden variety emotional distress claims generally merit $30,000 to $125,000 awards." (citation omitted)); *Abel v. Town Sports Int'l, LLC*, No. 09cv10388 (DF), 2012 WL 6720919, at *16 (S.D.N.Y. 2012) (collecting authority).

Plaintiff has offered some, although slight, evidence of treatment by a physician for stress and a doctor's opinion that his symptoms appear linked to workplace mistreatment. The nature and timing of the medical treatment sought by Plaintiff support the conclusion that it was causally connected to his wrongful termination and the financial difficulties that would logically flow from it. (*See* Tr., at 30-31 (Plaintiff testifying, *inter alia*, that, after he was fired, he had no money to pay rent).) At the same time, both Plaintiff's own description of his emotional state and the one physician's letter he has submitted are fairly general, and this Court is unable to gauge from Plaintiff's evidence the duration or severity of his emotional distress. Based on these

considerations, this Court finds that an award of damages at the low end of the customary range

is warranted.  In addition, as described above, as damages for emotional distress are available as

compensatory measures under both Title VII and the NYSHRL, such damages do not differ in

kind from the relief demanded in the Complaint.  Accordingly, this Court recommends awarding

Plaintiff $30,000 for his emotional distress.

## IV.   AMENDMENT OF CLAIMS

The Second Circuit has cautioned that courts "should not dismiss [*pro se* complaints]

without granting leave to amend at least once."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir.

2000).  A court need not grant such leave to amend, however, where amendment would be futile.

*See*, *e.g.*, *Savitsky v. Mazella*, 201 F. App'x 71, 72 (2d Cir. 2006) (affirming denial of leave to

amend where claim *pro se* plaintiff sought to add would be moot); *Jones v. New York State Div.*

*of Military & Naval Affairs*, 166 F.3d 45, 52 (2d Cir. 1999) (affirming denial of leave to amend

where claim plaintiff sought to add would not be justiciable).  In this case, to the extent this

Court is recommending that Plaintiff be awarded no damages on certain of his claims because

they have not been adequately pleaded (and where the Court is not recommending that he be

awarded damages for the same injury, via another claim), Plaintiff should be afforded an

opportunity to replead.  In particular, Plaintiff should be granted leave to replead the following

claims:

### A.   Discriminatory Failure to Promote

In order to state a claim for discriminatory failure to promote under any of the anti-

discrimination statutes Plaintiff invoked in his pleading, he would need to allege facts

demonstrating that, in addition to being a member of a protected class: (a) he applied and was

qualified for a job for which Defendant was seeking applicants, (b) he was rejected from the

position, and (c) either the position remained open and Defendant continued to seek applicants

having Plaintiff's qualifications, or the position was ultimately filled by a person not of the

protected class.  *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998) (citing

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *see also Raskin v. Wyatt Co.*,

125 F.3d 55, 63-64 (2d Cir. 1997).

Alternatively, if Plaintiff did not formally apply for a position for which he was qualified,

he could need to allege facts demonstrating that (a) the position was not posted, and (b) he either

had no knowledge of the position before it was filled by someone not of the protected class, or he

attempted to apply for the position through Defendant's informal procedures, but he was rejected

under circumstances giving rise to an inference of discrimination (*i.e.*, as above, that the position

remained open and Defendant continued to seek applicants having Plaintiff's qualifications, or

the position was filled by someone not of the protected class).  *Petrosino v. Bell Atlantic*, 385

F.3d 210, 227 (2d Cir. 2004); *see also Brown*, 163 F.3d at 710 n.2.

## B.   Discriminatory Reduction of Work Schedule and/or Denial of Benefits

To state a claim for discriminatory reduction of a work schedule and/or denial of vacation

or other benefits, in violation of federal and state anti-discrimination statutes, Plaintiff would

need to allege facts demonstrating that (1) he was qualified for the position he held, and (2) the

particular adverse employment decision at issue was made under circumstances giving rise to an

inference of unlawful discrimination.  *See*, *e.g.*, *Byrnie v. Town of Cromwell Bd. of Educ.*, 243

F.3d 93, 101 (2d Cir. 2001); *Elliott v. British Tourist Authority*, 172 F. Supp. 2d 395, 399.

Plaintiff may be able to make such a showing by alleging specific facts demonstrating that, for

example, other similarly situated individuals were given preferential treatment, *see*, *e.g.*,

*Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 407 (S.D.N.Y. 2012), or that

Defendant made specific "remarks that could be viewed as reflecting discriminatory animus" based on his national origin or age, *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007).

### C.   Additional Claims Arising from Plaintiff's Termination

Finally, even though this Court is recommending that Plaintiff be awarded damages under the NYLL for having been terminated in retaliation for making complaints of labor law violations, any award of liquidated damages under the NYLL, which are punitive in nature, would necessarily be capped at $10,000, as discussed above.  (*See supra* at Section III(B)(4).)  If, by way of amendment, Plaintiff could make out either a viable claim under Title VII for discriminatory discharge (which could be based on a "mixed motive" for his termination, *see* 42 U.S.C. § 2000e-2(m)), or a viable retaliatory discharge claim under the FLSA, he could potentially be entitled to a higher punitive damages award, as well as, in the case of retaliatory discharge under the FLSA, liquidated damages equal to the full amount of any back pay awarded, *see* 29 U.S.C. § 216(b).[34]

In order to state a claim for discriminatory termination of employment under Title VII, Plaintiff would have to allege that he is a member of a protected class and was qualified for the position he held, and he would also have to allege facts regarding his termination capable of giving rise to an inference of discrimination.  Such factual allegations could include, for example, allegations that an individual not of the protected class, *i.e.* somebody younger or of a different national origin, had replaced him, *see Owens v. New York City Housing Auth.*, 934 F.2d

---

[34] Based on various limitations in the damages that could be available under the other anti-discrimination statutes Plaintiff has invoked (*see supra* at Section III(B)(1)), or the fact that certain types of claims under those statutes cannot be based on a defendant's mixed motives, *see, e.g.*, *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (discussing retaliation claims under Title VII), it does not appear that Plaintiff could be entitled to additional damages, even by successfully repleading any other termination claims under those laws.

405, 410, or that, in the time leading up to his termination, Defendant's management made remarks reflecting discriminatory animus, *see Phillips v. Centrix Inc.*, 354 F. App'x 527, 529 (2d Cir. 2009).

In order to establish a *prima facie* case of retaliation under the FLSA, a plaintiff must show, as set out above (*see supra* at Section II(D)):  "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action."  *Torres*, 628 F. Supp. 2d at 472 (internal quotation marks and citation omitted).  Thus, in addition to the facts already pleaded, Plaintiff would need to allege facts capable of showing, or giving rise to an inference, that Defendant knew about his complaint to the Department of Labor and terminated his employment for that reason.

## **CONCLUSION**

For all of the foregoing reasons, I respectfully recommend that the Court award Plaintiff the following damages as a result of Defendant's default:

1. $2,827.50 as compensatory damages under Sections 206(a) and 216(a) of the Fair Labor Standards Act, on Plaintiff's claim for untimely paid wages; and

2. On Plaintiff's claim for retaliatory termination, in violation of Section 215(1)(a)(i) of the New York Labor Law:

   a. back pay in the amount of $18,552.00;

   b. prejudgment interest pursuant to C.P.L.R. § 5001 in the amount of $1,239.68;

   c. additional prejudgment interest pursuant to C.P.L.R. § 5002 at the rate of nine percent per annum on $19,761.68 – the sum of (a) and (b) – calculated from June 19, 2013 through the date of entry of final judgment;

       d.      liquidated damages in the amount of $10,000; and

       e.      $30,000 in damages for emotional distress.[35]

Finally, I recommend that Plaintiff be granted leave to amend his claims for (a) discriminatory failure to promote, (b) discriminatory reduction of work schedule and/or denial of benefits, (c) discriminatory termination under Title VII, and (d) retaliatory discharge under the FLSA, to remedy the pleading defects described herein, as the successful repleading of any of these claims could result in an award of additional damages.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable J. Paul Oetken, United States Courthouse, 40 Centre Street, Room 2101, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Oetken. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d

---

[35] As this sum, even accounting for any reasonably foreseeable accrual of interest, is well below the $350,000 demanded by Plaintiff in his Complaint, this award does not violate Rule 54(c)'s requirement that damages awarded on default not exceed the amount demanded in the Complaint.

298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v.*

*Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
      October 16, 2014

Respectfully submitted,

*Debra Freeman*

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. J. Paul Oetken, U.S.D.J.

Mr. Sainslot Belizaire
225-31 107th Ave.
Queens Village, NY  11429

RAV Investigative & Security Services Ltd
247 West 35th Street
5th Floor
New York, NY  10001

54

**Exhibit A: Summary of Docket Nos. 17 and 17-1**

| | Week ending | Check date | Days from work to check issuance | Check number | Net amount | Type(s) of document(s) | Notation(s) | Docket number(s) |
|---|---|---|---|---|---|---|---|---|
| 1 | 8/16/2009 | 8/21/2009 | 5 | 32052 | $256.10 | check stub | | 17-1 at 22 |
| 2 | 8/23/2009 | 8/28/2009 | 5 | 32274 | $256.10 | check stub | | 17-1 at 22 |
| 3 | 8/30/2009 | 9/4/2009 | 5 | 32433 | $256.10 | check stub | | 17-1 at 22 |
| 4 | | 3/15/2010 | | 15891 | $253.95 | check stub | | 17-1 at 19 |
| 5 | 4/25/2010 | 5/4/2010 | 9 | 40842 | $253.95 | check stub | | 17-1 at 19 |
| 6 | 5/2/2010 | 5/10/2010 | 8 | 14061 | $253.95 | check stub | | 17-1 at 19 |
| 7 | 5/6/2010 | 5/17/2010 | 11 | | | check stub | | 17-1 at 19 |
| 8 | 5/30/2010 | 6/7/2010 | 8 | 41960 | $253.95 | check stub | | 17-1 at 18 |
| 9 | 6/11/2010 | 7/19/2010 | 38 | 43131 | $253.95 | check stub | | 17-1 at 18 |
| 10 | | 8/9/2010 | | 17342 | $253.95 | check and check stub | | 17-1 at 17, 18 |
| 11 | | 8/17/2010 | | 43884 | $253.95 | check | | 17-1 at 20 |
| 12 | | 11/10/2010 | | 19030 | $253.95 | copy of check returned from bank | "refer to maker" | 17-1 at 16 |
| 13 | | 11/12/2010 | | 19058 | $313.95 | copy of check returned from bank | "refer to maker;" "replaced ck+fees;" made out to "Avenue Check Cashing Corp." | 17-1 at 16 |
| 14 | | 11/15/2010 | | 19149 | $253.95 | copy of check returned from bank | "refer to maker" | 17-1 at 16 |
| 15 | | 11/29/2010 | | 19641 | $253.95 | check stub | | 17-1 at 14 |
| 16 | | 11/29/2010 | | 19642 | $253.95 | check stub | "vacation" | 17-1 at 14 |
| 17 | | 12/6/2010 | | 19805 | $268.54 | check and check stub | | 17-1 at 14, 15 |
| 18 | | 3/7/2011 | | 9835 | $331.21 | check stub | | 17 at 18 |
| 19 | | 3/14/2011 | | 1019* | $252.66 | check stub | | 17 at 18 |
| 20 | | 6/6/2011 | | 10394 | $252.65 | check | | 17-1 at 3 |
| 21 | | 6/20/2011 | | | $274.22 | check stub | | 17 at 17 |

* This number is only partially legible on Plaintiff's submission.

**Exhibit A: Summary of Docket Nos. 17 and 17-1**

| | Week ending | Check date | Days from work to check issuance | Check number | Net amount | Type(s) of document(s) | Notation(s) | Docket number(s) |
|---|---|---|---|---|---|---|---|---|
| 1 | | 6/20/2011 | | 15380 | $207.15 | check stub | | 17-1 at 12 |
| 2 | | 7/5/2011 | | 1762* | $207.15 | check stub | | 17-1 at 12 |
| 3 | | 7/12/2011 | | 1643 | $252.66 | check stub and notice from Chase (dated 7/18/11) | "NSF;" additional fee of $12 | 17 at 17, 20 |
| 4 | | 7/18/2011 | | 1874 | $274.22 | check stub | | 17 at 18 |
| 5 | | 7/21/2011 | | 1921* | $252.66 | check stub | "replacement ck" | 17 at 17 |
| 6 | 7/17/2011 | 7/25/2011 | 8 | 10582 | $207.15 | check stub / earnings statement | | 17-1 at 7 |
| 7 | 7/24/2011 | 8/1/2011 | 8 | 10707 | $207.15 | check stub / earnings statement | | 17-1 at 7 |
| 8 | | 8/9/2011 | | 12027 | $160.08 | check stub | | 17-1 at 11 |
| 9 | | 8/15/2011 | | 12369 | $207.15 | check, check stub, and letter from Plaintiff to Defendant indicating check was returned due to insufficient funds (dated 9/15/11) | | 17-1 at 1, 4, 11 |
| 10 | | 8/30/2011 | | 15783 | $367.23 | check stub | | 17-1 at 6, 11 |
| 11 | | 9/14/2011 | | 15984 | $207.15 | check and copy of check returned from bank | "NSF" | 17 at 21; 17-1 at 10 |
| 12 | 9/11/2011 | 9/21/2011 | 10 | 16186 | $233.49 | check stub | | 17-1 at 10 |
| 13 | | 9/23/2011 | | 16236 | $471.30 | check stub | "replacement ck+fee" | 17-1 at 10 |
| 14 | 9/18/2011 | 9/28/2011 | 10 | 16343* | $207.15 | check stub | | 17-1 at 9 |
| 15 | 9/25/2011 | 10/6/2011 | 11 | 15294 | $207.15 | check stub | | 17-1 at 9 |
| 16 | 10/2/2011 | 10/11/2011 | 9 | 15428 | $207.15 | check stub | | 17-1 at 9 |

* This number is only partially legible on Plaintiff's submission.

2

**Exhibit A: Summary of Docket Nos. 17 and 17-1**

| | Week ending | Check date | Days from work to check issuance | Check number | Net amount | Type(s) of document(s) | Notation(s) | Docket number(s) |
|---|---|---|---|---|---|---|---|---|
| 1 | 10/30/2011 | 11/6/2011 | 7 | 15658 | $207.15 | check stub | | 17-1 at 8, 13 |
| 2 | 10/23/2011 | 11/8/2011 | 16 | 16652 | $240.54 | check, notice from Chase (dated 11/16/11), and letter from Plaintiff to Defendant regarding bounced check (dated 11/23/11) | "NSF," additional fee of $12 | 17 at 15, 19; 17-1 at 23, 24 |
| 3 | 10/30/2011 | 11/16/2011 | 17 | 1565* | $207.15 | check stub | | 17-1 at 13 |
| 4 | 11/6/11 and 11/13/11 | 11/25/2011 | 19, 12 | 15915 | $415.68 | check stub | | 17-1 at 8, 13 |
| 5 | | 11/30/2011 | | 15978 | $252.54 | check stub | "replacement ck+fee" | 17-1 at 7 |
| 6 | 11/20/2011 | 12/5/2011 | 15 | 16077 | $206.69 | check stub and copy of check | "NSF" | 17 at 16; 17-1 at 8 |
| 7 | | 12/27/2011 | | 16678 | $215.59 | check and check stub | | 17 at 22; 17 at 25 |
| 8 | | | | 16536 | | check stub | | 17-1 at 13 |
| 9 | | | | | | back of check and part of letter | endorsed by Plaintiff | 17-1 at 21 |
| 10 | | | | | $252.66 | check stub | | 17 at 17 |
| 11 | | | | | | back of check | blank | 17 at 23 |
| 12 | | | | | | back of check | blank | 17 at 24 |
| 13 | | | | | | back of check | endorsed by Plaintiff | 17-1 at 2 |
| 14 | | | | | | back of check | endorsed by Plaintiff | 17-1 at 5 |
| 15 | | | | 165* | | check stub | | 17-1 at 12 |

* This number is only partially legible on Plaintiff's submission.

3